**STATE of Delaware ex rel. David P. BUCK-SON, Attorney General, Plaintiff,**

**v.**

**The PENNSYLVANIA RAILROAD COMPA-NY, a corporation of the Commonwealth of Pennsylvania, Defendant.**

Superior Court of Delaware.

New Castle.

June 16, 1967.

David P. Buckson, Atty. Gen., and Ruth M. Ferrell, Deputy Atty. Gen., for plaintiff.

James L. Latchum, of Potter, Anderson & Corroon, Wilmington, for defendant.

DUFFY, Chancellor.*

This is the decision on the second phase of the action for declaratory judgment brought by the State of Delaware on the relationship of the Attorney General against The Pennsylvania Railroad ("The Pennsylvania"). As I have previously indicated, the controversy is over title and related rights to certain foreshore, which is a strip of soil between high and low water marks on the westerly side of the Delaware River. The State claims title and so does The Pennsylvania's lessor, The Philadelphia, Baltimore and Washington Railroad Company, from whom The Pennsylvania holds under lease. A full statement of the pertinent facts appears in the earlier opinion of the Court, Del., 228 A.2d 587 (1967).

In the prior opinion the Court asked two questions which were subsequently briefed and argued by counsel. This decision is on those questions, which are:

1. Has the State any power to legislate with respect to the waters in the foreshore, other than for purposes of fishing and navigation?

2. If the State does have such power, has it exercised that power in a way that precludes The Pennsylvania from building the dike and backfilling behind it without State consent?

A.

■ The Pennsylvania concedes that under its police power the State may enact reasonable regulations necessary to protect the lives, health, comfort and property of its citizens, and to promote the order, morals, safety and welfare of the public. Hence, the Railroad gives an affirmative answer to the first question.[1] While this is limited to an admission in an academic context, and at the same time the State has a somewhat different notion about the police power, these are tangential to the issue which the question proposes. The significance is in the nature of the answers, and both parties are on the "yes" side.

B.

I turn now to the question as to whether the State has exercised the power which it has over the waters in the foreshore. The easiest way to get at this is to take up, *seriatim,* the statutes which the parties have briefed and argued. The State urged these as exercises of its power and therefore the judicial basis for an affirmative answer to Question Two. The Pennsylvania had the other side, and, as it turns out, the better side of each contention.

■ (1) 23 Del.C. § 1104:[2] This is a criminal statute. I do not regard it as an exercise of State jurisdiction as to this foreshore because (a) there is no identifiable "public use" of the "river shore" in this case: the shore belongs to the Railroad and there is no showing of a public right to use it for any purpose (so the statute is not applicable by its terms); and (b) both its

---

* Sitting by assignment under the provisions of Art. 4, § 13 of the Delaware Constitution, Del.C.Ann.

1. Appeal of Lloyd, 9 W.W.Harr. 15, 196 A. 155; Gallegher v. Davis, 7 W.W. Harr. 380, 183 A. 620; Mayor and Council of Wilmington v. Turk, 14 Del.Ch. 392, 129 A. 512.

2. 23 Del.C. § 1104 provides:
"Whoever causes any obstruction to be erected or placed, or remain upon the shore of any navigable river in this State, so as to interfere with the public use of the river shore or harbor of any city or town situated upon the bank of such river, and after notice, allows the obstruction to remain unabated for the period of 30 days, shall be guilty of maintaining a public nuisance, and shall be fined not less than $1,000 nor more than $10,000. Upon conviction thereof, the defendant shall be required by order of court to remove such obstruction.

"Prosecutions under this section shall be brought in the county where such obstruction exists.

"The Attorney General, upon a proper representation by the authorities of any city or town of the existence of any obstruction in the harbor of such city or town, shall institute the proceedings as provided in this section."

statutory predecessor and the current application to a "navigable river" indicate that it was designed to deal with obstructions to navigation, a matter not pertinent because of the permit issued by the Corps of Engineers. 228 A.2d 587, 602.

■ (2) 17 Del.C. § 142:[3] This statute is comprehensive (it refers to "any beach or shoreline") in its direction to the Highway Department to perform work to prevent and repair erosion. But nothing in it permits the Department to act without a landowner's permission and, failing that, without court authorization. Under these circumstances, the statute is not helpful to the State.

(3) 55 Del.L., Ch. 442 (effective 7/1/66): The parties agree that this did not change prior law properly applicable to this case.

(4) 7 Del.C. § 4520 (now repealed): For present purposes, I need only note that this was applicable to State-owned property, not that which was privately owned.

■ (5) 23 Del.C. § 1505:[4] By its terms this statute is limited to tidewaters south of the northerly boundary of Edge Moor. The Court cannot move the boundary any further up the River than the Legislature quite definitely placed it. Within the specified area the Legislature provided an orderly

way for waterfront filling and the acquisition of title by a littoral owner. But from this specificity as to a defined area the Court cannot imply that tidewaters outside the area are subject to a State policy which is wholly unannounced. It is true that § 1507 provides:

"  *  *  *  No erection or structure of any kind shall hereafter be erected, allowed, or maintained beyond or *exterior* to such bulkhead line * * *." (Emphasis added.)

But use of the word "exterior" is clearly synonymous with or in further definition of the word "beyond" which relates to the "bulkhead line" and that in turn is parallel to the River shore. "Exterior" is not in any way applicable to areas lateral to the specified boundaries because the section deals only with the area "between the points referred to in section 1505".

■ (6) 7 Del.C. § 4703: This deals with the State's power to acquire land by eminent domain proceedings for certain purposes. I do not understand how the State can seriously argue that there is no difference between mere existence of the power to acquire by condemnation and the exercise of that power. There has been no showing of any such exercise as to this foreshore.

---

3. 17 Del.C. § 142 provides:
    "The Department shall provide, erect, construct, build, reconstruct and maintain such groins, jetties, banks, dikes, dunes, bulkheads, seawalls, breakwaters, and other facilities as may be determined by the Department, and make any other repairs or take any other measures along or upon any beach or shoreline area in this State as in the judgment of the Department may be necessary to protect the same from erosion by water or the elements or to repair damage that may have been caused by water or the elements. All such groins, jetties, banks, dikes, dunes, bulkheads, seawalls, breakwaters, other facilities and other improvements or structures authorized by this section shall be under the absolute jurisdiction, custody, care, management and control of the Department."

4. 23 Del.C. § 1505 provides:
    "The bulkhead line or lines of solid filling, and the pier line in the tidewaters of the River Delaware, lying between the Christina River and the northerly boundary of Edge Moor, opposite the City of Wilmington and Edge Moor, as fixed, established and adopted, or hereafter to be fixed, established and adopted, by the Secretary of the Army of the United States, under the acts of Congress in that behalf, are adopted and declared to be fixed and established as the exterior bulkhead and pier lines between the points, as such exterior bulkhead and pier lines so fixed, established and adopted, are or may hereafter be shown upon the manuscript map or maps, report or reports, filed in the office of the Secretary of the Army or the Department of the Army."

Hence this statute has no pertinency to the question which I must decide.

## C.

■ The State has also argued, relying on Black v. American International Corp., 264 Pa. 260, 107 A. 737 (1919), that under common law principles a riparian owner holding to low water mark may not artificially fill to that point and for this reason the Railroad's action required State consent.

It is apparently true, as The Pennsylvania argues, that in *Black* the entire tract in issue "was below ordinary low-water mark". 107 A. 738. But the Court restated certain principles established by Pennsylvania decisions and they should be considered here.

The Court said:

"Below its ordinary low water mark the ownership of the soil under the river is in the commonwealth, the title of the abutting riparian owner extending only to ordinary low-water mark, subject to the rights of navigation, fishery, and improvement of the stream between high and low water marks. * * * For this reason the riparian owner has no right to fill the river even to low-water mark * * * or to place obstructions therein between high and low water marks without express authority from the state."

The reasons, then, why fill or obstructions may not be placed in the foreshore in Pennsylvania (without State authority) are because of "navigation, fishery, and improvement of the stream". As to fishery, that is eliminated from this case for the reasons which are stated in 228 A.2d 602. As to navigation, it appears from a later Pennsylvania opinion involving the same land as in *Black* that the "United States

had abandoned its right to navigation over the land in dispute". Schoch v. American International Corporation, 286 Pa. 181, 133 A. 155, 157. Here we are dealing not with mere "abandonment" of navigation rights by the Federal Government but, additionally, with its express permission—"assent"—to construction of the dike and the filling behind it. For the reasons which appear at 228 A.2d 602, the State cannot declare the dike unlawful "so far as concerns the public rights of navigation".[5] This leaves for consideration the meaning of "improvement of the stream".

A review of the Pennsylvania cases prior to *Black* indicates that limitation upon the use of the foreshore in that State is based upon the view that a navigable river is a "highway". Thus, in Freeland v. Pennsylvania R. Co., 197 Pa. 529, 47 A. 745, 746, 58 L.R.A. 206, the Court referred to rights in the foreshore as "subject to the public rights of navigation over it, and of improvement of the stream as a highway." And in the earlier case of Commonwealth v. Young Men's Christian Ass'n, 169 Pa. 24, 32 A. 121, 127, the Court spoke of "The only right of the public * * * is to the use and navigation of said stream as a public highway". In McGunnegle v. Pittsburg & L. E. R. Co., 213 Pa. 383, 62 A. 988, 990, the Court said the qualified title was "subject to the right of navigation", a phrase substantially similar to that quoted from *Freeland,* supra.

The same approach was taken in Pursell v. Stover, 110 Pa. 43, 20 A. 403, 404, where the Court said "the public have a right of way for the purpose of navigation, which includes all that is reasonably necessary for that purpose." And in the earlier case of Palmer v. Farrell, 129 Pa. 162, 18 A. 761, the Court quoted the following language from Wood v. Appal, 63 Pa. 210, saying, as between a riparian owner "and the public,

---

5. I should also note that in *Schoch* the Court had before it a Pennsylvania statute, Act of June 27, 1913 (P.L. 665), which dealt with the widening of rivers and the issue of a patent for reclaimed land. To that extent the statute asserted a State policy with respect to and a jurisdiction over the foreshore.

he may use his land below high water mark for such purposes as do not interfere with the free flow and navigation of the waters".

While the language used in these cases varies, I think the dominant purpose is quite plain: the riparian owner could not prejudice navigation in the foreshore. That was the limitation upon his title. It therefore seems reasonable to conclude that when in *Black* the Court spoke of "improvement of the stream", it was referring only to its use for navigational purposes. And, for the reasons I have already indicated, that consideration is not available to the State in this case.

Since the Pennsylvania decisions provide the only basis on which the State here argues that common law principles preclude the Railroad from filling in the foreshore, it follows that these do not have that effect here.

\* \* \*

The second question proposed by the Court in the prior opinion is therefore answered in the negative.